#24061-a-RWS

**2007 SD 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JESSI OWENS,                                   Petitioner and Appellant,

  v.

DUANE RUSSELL, Warden,                         Respondent and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE DAVID R. GIENAPP
Judge

\* \* \* \*

EMILY M. SOVELL
Onida, South Dakota                       Attorney for petitioner
                                          and appellant.


LAWRENCE E. LONG
Attorney General

KATIE L. HANSEN
Assistant Attorney General
Pierre, South Dakota                      Attorneys for respondent
                                          and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 27, 2006

OPINION FILED **01/03/07**

#24061

SABERS, Justice

[¶1.]     Jessi Owens pleaded guilty to second degree murder for a beating death that occurred during a robbery.  Under the sentencing scheme, she received a mandatory life sentence.  On appeal, Owens raises five issues.  We affirm.

**FACTS**

[¶2.]     On January 28, 1998, seventeen-year-old Owens and nineteen-year-old Renee Eckes[1] went to the home of David Paul Bauman to steal $9,000.[2]  During their search for the money, Bauman returned home and Owens hid in the bathroom and Eckes hid in a different room.  At some point, Owens heard Eckes scream for help.  Owens left her hiding place and saw Eckes and Bauman struggling.  Owens used a hammer that Eckes threw to her to hit Bauman in the head several times.  Eckes took the hammer from Owens and began hitting Bauman.  According to Owens, it was Eckes who gave Bauman the majority of the blows.  Bauman was found dead the next day.

---

1.     Eckes pleaded guilty to second degree murder.  Like Owens, she received a mandatory life sentence.  State v. Eckes, No. 98-0076 (Codington County, SD 1998).

2.     Two other individuals were involved in the robbery/murder.  A juvenile defendant pleaded nolo contendre to accessory to murder and received a five-year sentence, two years suspended.  State v. J.C., No. 98-0364 (Codington County, SD 1998).  Nineteen-year-old Stacy Hanson pleaded guilty to aiding and abetting first degree burglary, second degree burglary and accessory to murder.  Hanson received twenty-five years for the first degree burglary, five years for the second degree burglary and five years on the accessory to second degree murder, all to be served consecutively.  State v. Stacy Hanson, No. 98-0080 (Codington County, SD 1998).

[¶3.]     The investigation of Bauman's death led police to suspect Owens and the others. Two days after the robbery/murder, the police arrested Owens. When the police found her, she was wearing boots with blood on them and blood was found in her car. Owens was questioned by two police officers from 12:20 a.m. to approximately 7:00 or 8:00 a.m.[3] At Owens' request, the interview was not recorded; therefore, there is no recording or transcript of the interview in the record. The officers did not attempt to contact a parent or attorney at any point during or before the questioning. Owens was emancipated at the time and had been for almost two years.[4]

[¶4.]     During the questioning, Owens admitted involvement in the murder. She also told police they had disposed of the hammer and clothes worn during the crime in rural Codington County. The defendants tried to conceal the evidence by burning it. The police found the charred remnants of the hammer and clothes worn during the crime.

[¶5.]     Owens was charged with first degree murder, first degree burglary and second degree burglary. She attempted to transfer the case to juvenile court. After the transfer hearing the motion was denied. Owens agreed to plead guilty to second degree murder. In exchange, the remaining charges, including first degree murder, would be dismissed. The plea agreement specifically provided that the mandatory minimum for second degree murder was a life sentence. She pleaded guilty to the

---

3.     The time on the statement indicates it was written at 4:40 a.m.

4.     Matter of Jessi R. Owens, Civ No. 96-1080 (Hamlin County, SD 1996).

second degree murder and received a sentence of life-in-prison. Owens appeals and

raises the following issues:

1. Whether Owens received ineffective assistance of counsel.

2. Whether Owens' statements to authorities were voluntary.

3. Whether Owens' plea of guilty was made knowingly and voluntarily.

4. Whether the mandatory life sentence is disproportionate.

5. Whether the habeas court's denial of comparative analysis through review of presentence reports in cases where the juvenile was charged, but not convicted, was erroneous.

## STANDARD OF REVIEW

[¶6.]        As we recently noted, "our standard of review for habeas review is well

established." Vanden Hoek v. Weber, 2006 SD 102, ¶8, ___NW2d___ (quoting

Crutchfield v. Weber, 2005 SD 62, ¶8, 697 NW2d 756 (quoting Jackson v. Weber,

2001 SD 136 ¶9, 637 NW2d 19, 22)) (additional citations omitted).

> Our review of habeas corpus proceedings is limited
> because it is a collateral attack on a final judgment. The
> review is limited to jurisdictional errors. In criminal
> cases, a violation of the defendant's constitutional rights
> constitutes a jurisdictional error. The defendant has the
> burden of proving he is entitled to relief by a
> preponderance of the evidence.
>
> The findings of facts shall not be disturbed unless they
> are clearly erroneous. A claim of ineffective assistance of
> counsel presents a mixed question of law and fact. The
> habeas court's conclusions of law are reviewed de novo.

*Id.* ¶¶8-9 (internal citations omitted). "The petitioner must overcome the 'strong

presumption that counsel's performance falls within the wide range of professional

assistance.'" Nikolaev v. Weber, 2005 SD 100, ¶8, 705 NW2d 72, 74-75 (quoting

Siers v. Class, 1998 SD 77, ¶12, 581 NW2d 491, 494 (citing Lykken v. Class, 1997 SD 29, 561 NW2d 302)). "Unless clear error is present, we defer to the habeas court's findings of fact regarding counsel's performance but, we may substitute our own judgment 'as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel.'" *Id.* We "will not compare counsel's performance to that of some idealized 'super-lawyer' and will respect the integrity of counsel's decision in choosing a particular strategy, these considerations must be balanced with the need to insure that counsel's performance was within the realm of competence required of members of the profession." Sprik v. Class, 1997 SD 134, ¶24, 572 NW2d 824, 829 (citing Roden v. Solem, 431 NW2d 665, 667 n1 (SD 1988)).

### *Ineffective assistance of counsel*

[¶7.] The well-settled test for determining whether the defendant received effective assistance of counsel was set forth in *Strickland v. Washington.* 466 US 668, 687, 104 SCt 2052, 2064, 80 LEd2d 674, 693 (1984). We adopted the *Strickland* test in *Luna v. Solem.* 411 NW2d 656, 658 (SD 1987).

[¶8.] The *Strickland* test is a two-part inquiry. The first part requires that

> the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Hofer v. Class, 1998 SD 58, ¶10, 578 NW2d 583, 585-86 (additional citations omitted).

[¶9.]     The second part of *Strickland* requires a showing of prejudice from counsel's deficient performance. 466 US at 693, 104 SCt at 2067. Prejudice requires "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 SCt at 2068. With regard to plea cases, the prejudice part of the *Strickland* test,

> will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged failure of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led *counsel* to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence *likely* would have changed the *outcome* of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Id.*

[¶10.]     Our prior cases indicate that a defendant has an "increased burden to show ineffective assistance of counsel" when the case does not proceed to trial. Coon v. Weber, 2002 SD 48, ¶12, 644 NW2d 638, 643; *Hofer*, 1998 SD 58, ¶11, 578 NW2d at 586; Williams v. State, 349 NW2d 58, 62 (SD 1984). This increased burden means the petitioner must demonstrate "gross error on the part of counsel in

recommending that he plead guilty." *Coon*, 2002 SD 48, ¶12, 644 NW2d at 643; *Hofer*, 1998 SD 58, ¶11, 578 NW2d at 586; *Williams*, 349 NW2d at 62.

[¶11.]     The United States Supreme Court has held that the *Strickland* test also applies to guilty pleas.  Hill v. Lockhart, 474 US 52, 58, 106 SCt 366, 369-70, 88 LEd2d 203 (1985) (holding "the two-part [*Strickland*] test applies to challenges to guilty pleas based on ineffective assistance of counsel").  The *Hill* Court also noted that the second part of *Strickland* test, the prejudice part, is slightly modified when the defendant pleads guilty.  *Id.* (noting "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial").  This *Hill* modification is the same as our prejudice inquiry when a guilty plea, rather than a trial, is involved. *Compare Hill*, 474 US at 59, 106 SCt at 370-71 *with Coon*, 2002 SD 48, ¶13, 644 NW2d at 643, Lien v. Class, 1998 SD 7, ¶15, 574 NW2d 601, 607-08.  Whether the prior cases that require a showing of gross error are sound in light of the United State Supreme Court's decision in *Hill* is immaterial here as Owens did not show either gross error or deficient performance.

### *Claimed deficient performance*

[¶12.]     Owens claims trial counsel was ineffective in several different ways. Trial counsel did not interview any of the potential witnesses to the crime, nor hire a private investigator.  There were no forensic experts hired or consulted.  Trial counsel did draft a motion for a pathology expert, but never filed the motion. Owens also argues counsel should have tried to suppress her confession, appeal from the transfer hearing or at least discuss the possibility of appeal with her.

Owens faults counsel for not researching the likelihood she would get the death penalty and claims he should have told her no female juvenile has ever received the death penalty in South Dakota.

[¶13.]     While the list of alleged deficiencies in counsel's performance is serious, our review of counsel's performance is highly deferential.  We start with the strong presumption that counsel's conduct falls within the range of reasonable professional assistance.  *Siers*, 1998 SD 77, ¶12, 581 NW2d at 495.  We view the actions in light of the past circumstances and information, not with the benefit of hind-sight.  *Coon*, 2002 SD 48, ¶11, 644 NW2d at 642.  Owens has the heavy burden of showing counsel's actions amounted to deficient performance and were not strategy.  *Sprik*, 1997 SD 134, ¶¶23-24, 572 NW2d at 829.

[¶14.]     Counsel testified at the habeas hearing that he was seriously concerned about the possibility of the death penalty.[5]  In fact, it was the main benefit of the plea bargain.  The State presented Owens with a plea bargain, which required her to plead guilty to second degree murder.  In exchange for her guilty plea, the State would drop all remaining adult and juvenile charges and eliminate the possibility of the death penalty.  While the State had not yet indicated it was going to seek the death penalty, counsel testified that from his conversations with

---

5.     This case occurred before the United States Supreme Court decision that declared juveniles cannot constitutionally receive the death penalty. *See* Roper v. Simmons, 543 US 551, 578, 125 SCt 1183, 1200, 161 LEd2d 1 (2005).

the State's Attorney he believed the death penalty was a "very, very real possibility."[6]

[¶15.] Owens now claims it was ineffective to encourage her to accept the plea when no female juvenile had ever been given the death penalty in South Dakota. Viewing the decision deferentially in light of the circumstances, this advice could be considered sound strategy. Counsel heard a lot of evidence and testimony against Owens during the transfer hearing so he knew the strength of the State's case against his client. He heard the police testify that Owens' codefendants said Owens planned to kill Bauman if he came home while they were robbing him. He saw the autopsy photographs depicting a violent murder. He heard DCI Agent Mike Braley testify to Owens' confession. Despite Owens' argument that she should have been informed that "statistically" she would not have received the death penalty, counsel

---

6.    Q:    Did you have an idea or an inclination or an indication that [the State was] looking at [the death penalty]?
A:    Well, I can't point to a specific date and time, but from my conversations with the State's Attorney and the evidence in the case I felt that it was a very, very real possibility.
Q:    Your conversations with the State's Attorney, that would be Mr. Ellyson?
A:    Yes.
Q:    And what was the tenor of those conversations as it related to the death penalty?
A:    Well, some of the – I guess how Mr. Ellyson viewed the [sum] of the evidence, the pictures of Mr. Bauman, and the manner in which Mr. Bauman was killed with the brutality.
Q:    Would it be fair to say that the crime scene photographs and evidence were rather gory?
A:    Yes.
Q:    Did that concern you as a factor that might play a role in a death penalty determination by a jury?
A:    Yes.

testified he knew the law was on the books, and there is a first time for everything, so he thought the death penalty was a real issue in this case. The State had a court imposed deadline to announce whether it was going to seek the death penalty and counsel believed that they were going to "have a problem" if they "let that deadline go by and . . . knew [they] were facing the death penalty. . . ." Encouraging Owens to take a plea that removes all other charges including the death penalty can be viewed as sound strategy.

[¶16.]       Owens also finds fault with trial counsel's decision not to attempt to suppress her confession during the transfer hearing. However, counsel testified he thought the confession could help during the transfer hearing because he thought it demonstrated Owens was taking responsibility for her actions. Given the fact that one of the factors for determining if a case should be transferred to juvenile court is the prospect for rehabilitation, allowing a confession in for the purpose of showing responsibility and rehabilitation potential may be sound strategy. In addition, counsel testified that he discussed her rights with her several times and discussed the possibility of suppressing her statement if it went to trial. Owens still chose to accept the State's plea agreement.

[¶17.]       The next claim is counsel's failure to attempt to suppress Owens' confession before trial. Specifically, Owens alleges her statement should have been suppressed because even though she was emancipated, she was a juvenile, who was interrogated by two male police officers for a substantial length of time and no parent, guardian or attorney was contacted. Nor was there a tape recording made of the interrogation. First, Owens objected to having the questioning tape recorded

so the police did not record it. Moreover, at the time of the case, we had not issued our decision that heightened the scrutiny of juvenile confessions without parental presence. *See* State v. Horse, 2002 SD 47, ¶26, 644 NW2d 211, 224. We do not expect counsel to know of a change in the law before it is issued. Ultimately, it is irrelevant whether the confession was or was not suppressed as there was ample evidence without the confession and Owens expressed a desire to plead guilty the entire time. *See supra* ¶15; *infra* ¶20.

[¶18.]        Counsel need not be trial ready before a trial has started. While counsel should be conducting a reasonable investigation into the circumstances before encouraging a client to plead guilty, counsel need not be absolutely trial ready before he allows his client to plead guilty. *See Lien*, 1998 SD 7, ¶41, 574 NW2d at 614 (Sabers, J., dissenting). However, counsel conducted some investigation. He read the police reports, read the police conducted interviews of the codefendants, attempted to close the transfer hearing to the public, made objections at the hearing that excluded the codefendants' statements against Owens from being considered in the transfer decision. He informed Owens of her rights and options, yet she continuously expressed a strong desire to plead guilty, even prior to the transfer hearing.

[¶19.]        Counsel's actions can be viewed as strategy. He did not suppress the confession before the transfer hearing because he thought it would demonstrate Owens' rehabilitation potential. Moreover, even had counsel moved to suppress the statement later and succeeded, there was still plenty of evidence that would lead reasonable counsel to conclude a plea bargain that removes the death penalty is a

good strategy. Owens has not met her burden of proving her counsel's performance fell below the standard.

***Prejudice***

[¶20.]     Even if counsel's performance "fell below an objective standard of reasonableness," Owens must demonstrate prejudice. *See Hofer*, 1998 SD 58, ¶¶9-10, 578 NW2d at 585-86. Trial counsel testified at the habeas hearing that Owens wanted to plead guilty almost from the beginning. She did not want to pursue the option of transfer to juvenile court and wanted to plead before the hearing. After the transfer motion was denied, she did not want to pursue any appeals from the transfer denial and again stated she wanted to plead guilty.

[¶21.]     Owens has to demonstrate "that there is a reasonable probability that, but for counsel's errors, [she] would not have pleaded guilty and would have insisted on going to trial." *See Hill*, 474 US at 59, 106 SCt at 370. Yet, Owens has not pointed to any evidence on the record that she would have insisted on going to trial, had trial counsel pursued a suppression hearing or informed her that female juveniles have never received the death penalty in South Dakota.

[¶22.]     The record shows the State had ample evidence to proceed to trial on the first degree murder charge, even assuming Owens' confession was suppressed. The investigation led to Owens and the other defendants. When the police arrested Owens she had human blood on her boots and in her car. Finally, the other codefendants pleaded guilty and made very damaging statements regarding Owens' culpability in the murder. These statements were brought out during the transfer hearing, so trial counsel knew there was a distinct possibility the State could have

the codefendants testify against Owens if they pleaded guilty first. Finally, there was evidence Owens was the one that brought the murder weapon.[7]

[¶23.]    This independent evidence coupled with the fact Owens continually expressed her desire to plead guilty supports the habeas court's decision that Owens was not denied effective assistance of counsel or prejudice thereby. She has not met her burden of proving she would have rejected the guilty plea and went to trial had counsel performed differently. Even if trial counsel performed deficiently, Owens has not shown prejudice from the deficient performance. Therefore, we affirm.

*Plea bargain*

[¶24.]    "[A] direct appeal is afforded more intense scrutiny than if the challenge is by a collateral habeas corpus action." State v. Goodwin, 2004 SD 75, ¶4, 681 NW2d 847, 849. We look at the totality of the circumstances when reviewing a guilty plea and must examine if the "plea was voluntary, knowing and intelligent." *Lien*, 1998 SD 7, ¶31, 574 NW2d at 612.

[¶25.]    In determining whether the plea was voluntary, we examine whether the record "indicates a free and intelligent waiver of the three constitutional rights mentioned in *Boykin* – self-incrimination, confrontation and jury trial – and an understanding of the nature and consequences of the plea." *Goodwin*, 2004 SD 75, ¶6, 681 NW2d at 850 (quoting Nachtigall v. Erickson, 85 SD 122, 128, 178 NW2d 198, 201 (1970)); Boykin v. Alabama, 395 US 238, 243, 89 SCt 1709, 1712, 23 LEd2d

---

7.    At the transfer hearing, Jacob Bolton, a friend of Owens, testified that when the murder occurred Owens was watching his house while he was out-of-town and he was missing a hammer.

274 (1969). "[T]he defendant must know and understand that entering a plea of guilty constitutes a waiver of these rights." *Goodwin*, 2004 SD 75, ¶6, 681 NW2d at 850 (citing *Boykin*, 395 US at 243-44, 89 SCt 1709). In addition to the waiver of the constitutional rights, we look at the following factors: "the defendant's age; his prior criminal record; whether he is represented by counsel; the existence of a plea agreement; and the time between advisement of rights and entering a plea of guilty." *Id.* ¶11 (internal citations omitted).

[¶26.]     SDCL 23A-7-4 provides the procedure to establish whether a guilty plea is intelligent, knowing and voluntary:

> Before accepting a plea of guilty or nolo contendere a court must address the defendant personally in open court, subject to the exception stated in 23A-7-5, and inform him of, and determine that he understands, the following:
>
> (1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law;
>
> (2) If the defendant is not represented by an attorney, that he has the right to be represented by an attorney at every stage of the proceedings against him and, if necessary, one will be appointed to represent him;
>
> (3) That he has the right to plead not guilty or to persist in that plea if it has already been made, and that he has the right to assistance of counsel, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself;
>
> (4) That if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself; and

(5) That if he pleads guilty or nolo contendere, the court may ask him questions about the offense to which he has pleaded, and if he answers these questions under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury.

[¶27.]    During a motion hearing on February 11, 1998, the circuit court discussed the defendant's rights in open court on the record. The circuit court again discussed the defendant's rights before she pleaded guilty at the plea hearing on May 28, 1998.[8]  Finally, trial counsel discussed Owens' rights with her prior to the entry of the guilty plea, as evidenced by the Statement of Rights and Facts and Circumstances, which counsel entered into evidence during the guilty plea/sentencing hearing. Owens was aware of her constitutional rights and indicated she understood she was waiving these rights, both on the record, and in the statement of rights prepared by her attorney.

[¶28.]    Under the totality of the circumstances analysis, Owens' guilty plea was not shown to be involuntary, unknowing or unintelligent. Owens was only seventeen years old and had a ninth grade education, but one of the experts testified she was of average or above average intelligence. She had a criminal record of multiple alcohol violations and two shoplifting charges, which indicates she had experience with the legal system.[9]  Her counsel discussed her rights and

---

8.    This is important because we also look at "the time between advisement of rights and entering a plea of guilty." *Goodwin*, 2004 SD 75, ¶11, 681 NW2d at 852.

9.    As one expert noted, her shoplifting charges also indicate an awareness of her rights and an awareness of her ability to exercise her rights. Owens indicated that she would not plead guilty to the shoplifting charge and was

(continued . . .)

there was a plea bargain. The plea bargain clearly stated she was to plead guilty to second degree murder and the statute mandated a life sentence. Reviewing the totality of the circumstances, there is no showing that the habeas court erred in determining that this issue was without merit and we affirm.

### *Cruel and unusual*

[¶29.]     Owens argues that a mandatory life sentence violates the Eighth Amendment and the sentencing judge should have discretion to consider Owens' youth and childhood as mitigating factors to allow a sentence less than life. There is no constitutional basis for this argument as Owens received a mandatory life sentence for murder and a life sentence for murder is not cruel and unusual or grossly disproportionate. *See* State v. Frazier, 2002 SD 66, ¶24, 646 NW2d 744, 752-53 (mandatory life sentence for felony murder); State v. Milk, 2000 SD 28, ¶20, 607 NW2d 14, 21 (life sentence for first degree manslaughter was not grossly disproportionate); State v. Jensen, 1998 SD 52, ¶64, 579 NW2d 613, 624-25 (life sentence for first degree murder). Owens' argument should be addressed to the legislature.

[¶30.]     Since Owens' cruel and unusual claim fails, the only way Owens could challenge her sentence is to show that she did not enter her guilty plea voluntarily, knowingly and intelligently or through an ineffective assistance claim. However,

---

(. . . continued)
    going to fight it because she did not do it. The expert also thought Owens exhibited an awareness of her ability to exercise her rights and that she was not intimidated by the police, when she told the police she did not want to have her interview recorded.

Owens' sentence was not unknown. When Owens pleaded guilty, she knew that she could not receive any sentence other than life-in-prison. As discussed above, Owens has not met her burden to show her guilty plea was involuntary or that she received ineffective assistance. In light of our decision on this issue, we need not discuss Issue 5.

[¶31.]     We affirm the habeas court.

[¶32.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.