#29634-a-JMK
**2022 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JOSHUA SPANIOL,                                   Petitioner and Appellant,

    v.

DARIN YOUNG, Warden,
South Dakota State Penitentiary,                  Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KENT A. SHELTON
Judge

* * * *

JOHN R. HINRICHS of
Heidepriem, Purtell, Siegel
  & Hinrichs, LLP
Sioux Falls, South Dakota                         Attorneys for petitioner and
                                                  appellant.


MARK VARGO
Attorney General

CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                              Attorneys for respondent
                                                  and appellee.

* * * *

CONSIDERED ON BRIEFS
JANUARY 10, 2022
OPINION FILED **10/19/22**

#29634

KERN, Justice

[¶1.]     Joshua Spaniol was convicted of raping and having sexual contact with his four-year-old autistic daughter.  Spaniol appealed his conviction, which was affirmed.  Thereafter, he filed a petition for habeas corpus alleging that his trial counsel was ineffective by failing to retain an expert witness, object to certain exhibits during trial, and investigate alleged third-party perpetrator information.  After an evidentiary hearing, the circuit court denied the petition.  Spaniol appeals.  We affirm.

## Factual and Procedural Background

[¶2.]     Spaniol was convicted of three counts of first-degree rape and one count of sexual contact with a child under sixteen involving his daughter, A.S., who was four years old at the time and had been diagnosed with Autism Spectrum Disorder (ASD).  The sexual abuse first came to light when Spaniol's wife and A.S.'s mother (Mother) noticed that A.S. had a brown vaginal discharge.  Mother took A.S. to a physician who took a sample and sent it to a lab for testing.  Two days later, Spaniol saw his doctor for a painful, inflamed, and discharging infection in his penis.  After falsely informing the doctor that he was in a monogamous sexual relationship with Mother, the doctor ruled out and did not test for sexually transmitted diseases (STDs) and instead tentatively diagnosed Spaniol's ailment as a urinary tract infection (UTI).  The doctor sent a sample of Spaniol's urine for testing and prescribed Cipro, an antibiotic, to be taken twice per day for ten days pending the test results.

-1-

[¶3.] Over the course of a few days, A.S.'s condition worsened, and Mother took her to an emergency room. Medical staff suspected that A.S. had an STD and alerted Child Protection Services and the Watertown Police Department. A detective contacted Spaniol who came to the police department for an interview. When asked about A.S.'s symptoms, Spaniol reported that he and A.S. sometimes bathed together and that he had a genital rash but not a discharge. Spaniol was not arrested and returned home.

[¶4.] The following day, A.S.'s test results established that she had gonorrhea. Spaniol and Mother were asked to come to the police station for further interviews. After they arrived, they were placed in separate interview rooms. Spaniol was initially questioned by Sergeant Stahl of the Watertown Police Department. He was informed that he was not under arrest and was not in custody. During a videotaped interview, Spaniol was asked if he knew why he was called back to the station for interviews and he speculated that it was because he admitted to bathing with A.S. He eventually admitted that contact between his penis and A.S. had occurred while bathing but claimed that it was accidental. Shortly after this admission, Sergeant Stahl left the room.

[¶5.] Division of Criminal Investigation Special Agent (SA) Corey next entered the room. SA Corey confirmed with Spaniol that he knew that he was not under arrest and that the interview room door was closed only for privacy purposes. Spaniol repeated his story that while bathing naked with A.S., she slipped and fell on his "semi-erect penis, causing penetration." Spaniol's story eventually evolved into admitting that on two occasions he had "rubb[ed] his penis on the labia of A.S.'s

vagina, and plac[ed] his penis in her vagina after ejaculating." When asked, Spaniol admitted this had happened more than three times. Sergeant Stahl subsequently entered the room and asked Spaniol who should tell his wife about what he had done, and Spaniol responded that he would. Officers brought Mother to the interview room and Spaniol confessed to her, still on camera, that he had "messed around" with A.S. and had rubbed his penis on her. Spaniol was later advised of his Miranda rights. After waiving these rights, Spaniol ultimately admitted that he had penetrated A.S. on four occasions.[1]

[¶6.]        Spaniol's urine test taken at the time of his doctor's appointment came back negative for a UTI. Although law enforcement officers arranged for another sample to be taken from Spaniol to test for gonorrhea after his confession, this sample, obtained five days after Spaniol had been taking Cipro for his UTI, came back negative. Expert testimony at trial revealed that just one dose of Cipro will cure gonorrhea 85–90% of the time.

[¶7.]        Mother took A.S. to Child's Voice, an advocacy center in Sioux Falls where children who may have been abused are forensically interviewed by trained professionals. A.S. participated in a videotaped interview with Robyn Niewenhis and reported that her dad had hurt her on several occasions. When asked where, she pointed to her vaginal area. Further, A.S. indicated that her dad used his finger to hurt her and that it went in her body, pointing again to her vaginal area.

---

1.    Prior to trial, Spaniol's counsel moved to suppress Spaniol's statements to law enforcement, which the circuit court denied after an evidentiary hearing. We affirmed this determination on direct appeal. *See State v. Spaniol*, 2017 S.D. 20, ¶ 47, 895 N.W.2d 329, 345.

[¶8.] Spaniol's counsel filed a motion prior to trial, challenging A.S.'s competency to testify because of her age and ASD, alleging she would be difficult to understand. The circuit court held a competency hearing at which A.S. testified and was subjected to cross-examination. The court found A.S. competent to testify, concluding that "[a]lthough A.S. has several developmental delays and limitations in her ability to communicate, A.S. has sufficient mental capacity to observe and recollect, A.S. has an ability to communicate, and A.S. has some sense of moral responsibility." At trial, the State presented strong evidence against Spaniol including the following: A.S.'s direct testimony and the Child's Voice interview, in which she stated that her father had "hurted [her] potty"; her gonorrhea diagnosis and Spaniol's simultaneous infection and potential gonorrhea; Spaniol's videotaped confessions to law enforcement officers and to Mother in which he admitted penetrating A.S. with his penis; and Spaniol's cell phone search history which included searches for role-playing father/daughter pornography and a query into whether STDs could be transferred through water.

[¶9.] In his defense, Spaniol advanced the theory that he could not have given A.S. gonorrhea because he was not infected and speculated that either a third-party perpetrator molested A.S. and gave her gonorrhea, or A.S. contracted gonorrhea by playing with a sex toy in their home that had been used by someone with gonorrhea. After deliberation, the jury found Spaniol guilty of three counts of first-degree rape and one count of sexual contact with a child under sixteen. A more detailed version of the facts surrounding the convictions is set forth in *State v.*

*Spaniol*, 2017 S.D. 20, 895 N.W.2d 329, wherein we affirmed Spaniol's convictions on direct appeal.

[¶10.]     Spaniol filed a pro se application for writ of habeas corpus on July 6, 2017, alleging that his conviction was unconstitutional due to ineffective assistance of counsel. The habeas court appointed counsel for Spaniol on July 18, 2017. Spaniol filed an amended petition for writ of habeas corpus on September 12, 2018. In the amended petition, Spaniol alleged that trial counsel had been ineffective for failing to retain an expert on the issue of A.S.'s competence, failing to object to Exhibit 11 (the Child's Voice summary of A.S.'s forensic interview) and Exhibit 12 (the recording of A.S.'s Child's Voice interview), and failing to further investigate potential third-party perpetrators. The habeas court held an evidentiary hearing on the petition on May 8, 2019. At the hearing, Spaniol called Dr. Kenneth Hasseler, a licensed psychologist, Mother, and Tim Nisich, Spaniol's uncle. With the permission of the circuit court, Spaniol later submitted an affidavit from Reed Anderson, a man Mother dated shortly after Spaniol's conviction, who was unavailable to testify in person because he was incarcerated.

[¶11.]     Dr. Hasseler was qualified as an expert witness in the field of psychology, having worked with children with neurodevelopmental conditions and disorders, including autism. Spaniol retained Dr. Hasseler to render an opinion regarding A.S.'s competency to testify at the trial, specifically, whether A.S. had "sufficient mental capacity to observe, recollect, and communicate [with] some sense o[f] moral responsibility" in light of her young age and her ASD diagnosis. In order to form his opinion, Dr. Hasseler reviewed the transcript of the competency hearing

and the evidence the State introduced regarding A.S., including her forensic interview at Child's Voice; her medical progress notes; a psychological evaluation summary; a report from Sanford Children's Specialty Clinic; and a Watertown School District multidisciplinary report. Based on this review, Dr. Hasseler testified that, in his opinion, A.S. lacked "timeline intention[,]" meaning that "[s]he can't tell you time. She cannot recount events." Further, Dr. Hasseler testified that A.S. was "highly suggestible" and lacked "social communication processing" skills. Dr. Hasseler concluded that A.S. "did not exhibit the capacity to understand or answer simple questions accurately, consistently, or to observe or recall events pertinent to the case other than in a very cursory manner."

[¶12.] Dr. Hasseler's expert report was also admitted at the hearing, in which he concluded that he did "not believe that [A.S.] exhibits or exhibited the capacity to give reliable testimony at trial." Notably, he qualified his conclusion by stating that he believed "that her spontaneous report when [A.S.] says her dad 'hurted' her [in the Child's Voice interview] . . . was probably an accurate general statement of something [that] happened to her in the past with her father." Spaniol offered Dr. Hasseler's testimony to support his claim that expert testimony of this nature would have benefited the circuit court in making the competency determination and that trial counsel erred in failing to retain such an expert.

[¶13.] Spaniol next called Mother to question her about her relationship with Reed Anderson, who had lived with her for about three or four months after Spaniol's trial and conviction. Spaniol asked Mother whether she told Anderson that she caught a man coming out of A.S.'s bedroom one evening when she and

Spaniol had a couple over for extramarital intimacy. Mother adamantly denied seeing a man coming from A.S.'s bedroom or having told Anderson about such a thing occurring. Mother also denied telling Anderson that she "couldn't believe that [Spaniol] was going to prison for the rest of his life for something that he didn't do" and called Anderson a "compulsive liar." In an attempt to develop this third-party perpetrator theory, Spaniol also questioned Mother about two individuals—David Hill and Melanie Johnson. Mother, however, testified that although she knew a person named David Hill from high school, she had never accused him of molesting A.S. She also testified that she did not recall knowing anyone with the name Melanie Johnson.

[¶14.]        Spaniol next made an offer of proof regarding what Anderson's anticipated testimony would be. Spaniol proffered that Anderson would testify that Mother "would frequently drink to intoxication and get very emotional and make statements. Like it wasn't him that did it—him referring to Mr. Spaniol." Spaniol further proffered that Anderson would testify that Mother told him she and Spaniol once "had a couple in their home for extramarital relations. . . . That while the woman was with Mr. Spaniol, [Mother] caught the man coming out of A.S.'s bedroom[,]" and that Mother "expressed that she suspected that David Hill or Melanie Johnson were responsible for any abuse that A.S. would have suffered and disclosed." Finally, Spaniol stated that Anderson would testify that he was never contacted by Spaniol's trial attorney or interviewed by anyone in connection to Spaniol's case.

[¶15.] Spaniol's last witness was Tim Nisich, his uncle, who testified about speaking with Anderson after Anderson contacted Nisich through Facebook. Nisich testified that Anderson told him a story about Mother, David Hill, and Melanie Johnson. Nisich explained that he informed Spaniol's trial attorney both before and after the trial about Anderson's story. Nisich reported that in response, Spaniol's trial attorney told him that he "needs more. He needs to have proof or something to go after that information." Nisich clarified that to his knowledge, Spaniol's trial attorney had not investigated the story further.

[¶16.] The State called Terry Sutton, who represented Spaniol at trial and on direct appeal. Sutton, an experienced attorney, testified that he had participated in more than a hundred criminal jury trials during the course of his career and had represented more than ten defendants charged with sex offenses. He relayed that the primary obstacles he faced in defending Spaniol were his videotaped confessions to law enforcement and to Mother, which he considered to be the most damaging evidence and "very compelling." Sutton explained that a secondary issue in Spaniol's trial was A.S.'s competency. To address that issue, Sutton's strategy was to file a competency motion with two goals: "Number one, determine the competency issue itself. But number two, to begin to establish the child's testimony wasn't credible. In other words, use the testimony from the competency open proceeding. If it was allowed as evidence, use it at trial."

[¶17.] When questioned why he did not hire an expert to evaluate A.S. and testify at the competency hearing or assist him in preparing for the hearing, Sutton explained:

> I didn't expect, frankly, that—or anticipate from a trial strategy standpoint, I contemplated that she was going to be allowed to testify. And if she was going to be allowed to testify, as I said before, my intent was to create credibility concerning her ability to accurately recall and testify in those competency motions to be used for impeachment purposes of a child at trial.

Sutton testified that his cross-examination of A.S. exposed her testimony as unreliable and inconsistent and that her "stories were continuing to be different from the previous ones." Additionally, Sutton relayed that he did not need an expert to assist him because he had no difficulty understanding the reports introduced at the competency hearing, the same reports which were later reviewed by Dr. Hasseler in forming his opinions. He also "believed [A.S.'s] testimony would have little effect on the outcome of the trial" because he thought that "the confessions bore much more weight." Sutton testified that in his opinion "the most likely reason for the conviction was the confessions."

[¶18.] As to Nisich's testimony and the proffer of Anderson's testimony, Sutton responded that Nisich never told him about Anderson's story or about anything that would have implicated David Hill or Melanie Johnson in the molestation of A.S. Prior to trial, Sutton had hired a private investigator to look into any possible third-party perpetrators, but the investigator was unable to "establish any evidence beyond speculation that there might have been a third-party perpetrator." Sutton testified that "from after sentencing until jurisdiction went to the Supreme Court[,]" nobody talked to him about any newly discovered third-party perpetrator evidence. During re-cross-examination, Spaniol introduced a letter written by Sutton to Spaniol while the appeal was pending, in which Sutton stated that he received some information from Spaniol's mother, but that he had

"repeatedly informed" her that "I will need to have something more to go on and at this point there is nothing more than someone told someone else etc." Sutton "agree[d] that the letter speaks for itself[,]" but stated that "I don't know what [Spaniol's family] believed. I don't recall that conversation as I am here today."

[¶19.]   On November 27, 2019, by agreement of the parties and with the habeas court's consent, Spaniol filed an affidavit from Reed Anderson which confirmed the assertions Spaniol made in his offer of proof at the habeas evidentiary hearing. The habeas court requested written briefs from the parties and took the matter under advisement.

[¶20.]   The habeas court issued a memorandum opinion, findings of fact and conclusions of law, and an order denying Spaniol's petition for habeas corpus relief. The court determined that Sutton's representation did not amount to ineffective assistance and that Spaniol had failed to demonstrate prejudice resulting from Sutton's performance. Spaniol moved for and received a certificate of probable cause from the habeas court permitting him to seek review of the following issues, which we restate as follows:

1. Whether trial counsel provided ineffective assistance by:
   i. Failing to retain an expert witness in support of his motion regarding A.S.'s competency and to assist in cross-examination of A.S.;
   ii. Failing to object to the admission of Exhibits 11 and 12 at trial; and
   iii. Failing to investigate or act on new evidence of a third-party perpetrator.

2. If trial counsel provided ineffective assistance, whether Spaniol was prejudiced therefrom.

## Standard of Review

[¶21.] "We review a circuit court's determination of a Sixth Amendment ineffective assistance of counsel claim as a mixed question, reviewing the court's decision on the constitutional issue de novo and its findings of fact for clear error." *Reay v. Young*, 2019 S.D. 63, ¶ 13, 936 N.W.2d 117, 120 (quoting *Madetzke v. Dooley*, 2018 S.D. 38, ¶ 8, 912 N.W.2d 350, 353). "Claims of ineffective assistance of counsel must be evaluated in light of the totality of the circumstances." *Dillon v. Weber*, 2007 S.D. 81, ¶ 11, 737 N.W.2d 420, 425 (citing *Iron Shell v. Leapley*, 503 N.W.2d 868, 872 (S.D. 1993)). The petitioner, in this case, Spaniol, bears the burden of proving his entitlement to habeas relief by a preponderance of the evidence. *McDonough v. Weber*, 2015 S.D. 1, ¶ 15, 859 N.W.2d 26, 34 (citing *Vanden Hoek v. Weber*, 2006 S.D. 102, ¶ 8, 724 N.W.2d 858, 861).

## Analysis and Decision

[¶22.] Spaniol's claim of ineffective assistance of counsel is analyzed under the two-prong *Strickland v. Washington* standard:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

[¶23.]     To show that his trial counsel was ineffective, first, Spaniol must overcome the "strong presumption that counsel was competent." *Reay*, 2019 S.D. 63, ¶ 14, 936 N.W.2d at 120–21 (internal quotation marks omitted) (citation omitted). Spaniol must show that his trial counsel's representation fell below an "objective standard of reasonableness." *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 38 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064). In reviewing counsel's performance, we must make "every effort" to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. In other words, Spaniol must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 38 (citation omitted).

[¶24.]     If we determine that Spaniol has shown that his counsel was ineffective, we then must determine whether Spaniol's defense was prejudiced by the ineffective assistance. Prejudice from ineffective assistance of counsel exists when there is a "reasonable probability of a different outcome." *Knecht v. Weber*, 2002 S.D. 21, ¶ 5, 640 N.W.2d 491, 495. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* (citation omitted.)

***Trial Counsel's Decision not to Retain an Expert Witness***

[¶25.]     Spaniol first contends that his trial counsel's performance fell below the objective standard of reasonableness because he failed to retain an expert witness both in support of his motion to have A.S. declared incompetent to testify

and to aid him in planning an effective cross-examination of A.S. at trial. Spaniol argues that trial counsel's efforts to suppress his confessions on Fifth Amendment grounds would have been better spent by attempting to have A.S. "declared not competent to testify, or at least in preparing to cross-examine A.S." Further, Spaniol argues that adequate efforts in regard to A.S.'s competency "would have included obtaining the assistance of an expert witness"; therefore, "trial counsel's failure to obtain the assistance of an expert witness can be sufficient error to overturn the conviction." Based on our review of the record, we determine that Spaniol has failed to demonstrate that trial counsel's decision not to hire an expert constitutes ineffective assistance of counsel.

[¶26.] Generally, "[f]ailure to hire an expert is not, per se, error." *Knecht*, 2002 S.D. 21, ¶ 20, 640 N.W.2d at 500. Rather, the "decision to call (or not to call) an expert is a matter of trial strategy[,]" and "this Court will not second guess experienced counsel . . . regarding trial tactics or strategy." *Id.* ¶ 21, 640 N.W.2d at 500–01 (citations omitted). As the United States Supreme Court has recently stated:

> [W]e have often explained that strategic decisions—including whether to hire an expert—are entitled to a "strong presumption" of reasonableness. Defense lawyers have "limited" time and resources, and so must choose from among "countless" strategic options. Such decisions are particularly difficult because certain tactics carry the risk of "harm[ing] the defense" by undermining credibility with the jury or distracting from more important issues.

*Dunn v. Reeves*, 141 S. Ct. 2405, 2410, 210 L. Ed. 2d 812 (2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 104–08, 131 S. Ct. 770, 787–90, 178 L. Ed. 2d 624 (2011)) (internal citations omitted).

-13-

[¶27.]     Spaniol cites *Dillon v. Weber* for the proposition that the singular failure to obtain the assistance of an expert witness can be sufficient error to overturn a conviction.  2007 S.D. 81, 737 N.W.2d 420.  In *Dillon*, we determined that the failure to call an expert was error.  *Id.* ¶ 16.  Applying the criteria discussed above, in *Dillon*, we considered how expert testimony "was critical to Dillon's defense" because "there was no physical evidence of sexual assault . . . and the entire case turned on the credibility of the victims."  *Id.* ¶ 14, 737 N.W.2d at 426.  We more recently considered whether failure to call an expert witness constituted ineffective assistance of counsel in *Reay v. Young*, 2019 S.D. 63, 936 N.W.2d 117.  In *Reay*, we concluded that trial counsel's decision not to engage several defense experts to assist him was not ineffective assistance of counsel but rather a matter of sound trial strategy.  *Id.* ¶ 26–27.  Reay's trial counsel testified that he decided not to retain certain experts because of the risk of alerting the State to the defense's planned trial arguments, the risk that the experts' conclusions would ultimately be unfavorable to the defense, and trial counsel's ability to make the planned arguments without the use of experts.  *Id.* ¶ 16–23.

[¶28.]     In our view, trial counsel's decision not to engage an expert to opine on A.S.'s competency was made as part of a reasonable trial strategy.  In particular, counsel's view that A.S. would likely be found competent was based upon his candid and reasonable professional judgment, and his plan to develop inconsistencies in A.S.'s testimony in an effort to undermine her credibility was equally sound.  Trial counsel also testified that he was able to comprehend the exhibits introduced at A.S.'s competency hearing without expert assistance.  Additionally, the opinion Dr.

Hasseler provided at the habeas hearing pertained more to the reliability of A.S.'s testimony than to her competency to testify, and some opinions relating to the accuracy of A.S.'s statements may not have been admissible. Based on the testimony from the habeas hearing, Spaniol provides no persuasive argument that, had trial counsel hired an expert, A.S. would have been determined incompetent to testify at trial.

[¶29.] Furthermore, Spaniol's claim that the lack of expert testimony "eliminated any opportunity to dispute the reliability of [A.S.'s] statements before the jury" is not accurate. As we have indicated, trial counsel developed a strong framework from which to impeach A.S.'s credibility and the reliability of her statements. After A.S.'s testimony at trial,

> the parties eventually stipulated that Spaniol could read several of A.S.'s prior questions and answers [from the competency hearing] to the jury at the close of Spaniol's case-in-chief. Further, the parties agreed the jury would be advised the statements could be considered as prior inconsistent statements made by A.S. under oath at a prior proceeding. Additionally, the circuit court gave the jury an instruction regarding the proper manner in which to evaluate prior inconsistent statements.

*Spaniol*, 2017 S.D. 20, ¶ 27, 895 N.W.2d at 340. Not only did trial counsel establish inconsistencies derived from A.S.'s competency hearing, the circuit court specifically instructed the jury they could consider them as such.

[¶30.] Further, unlike the situation in *Dillon*, expert testimony regarding A.S.'s competency was not "critical to the defense" as the entire case did not "turn on" A.S.'s credibility. 2007 S.D. 81, ¶ 14, 737 N.W.2d at 426. The State in the underlying trial presented other highly inculpatory evidence, including Spaniol's taped confessions; corroborating evidence of Spaniol's suspected gonorrhea,

manifesting with an infection in his penis; and his incriminating internet search history. This information obtained from his cell phone included searches for content depicting role-playing father/daughter sexual encounters and a search for whether an STD can "be transmitted through water." These search inquiries occurred before Spaniol was interviewed by police and before he received the results of his negative test for a UTI.

[¶31.] Because trial counsel's decision not to retain an expert for the competency hearing could be considered a matter of sound trial strategy, we conclude that trial counsel's performance did not fall below the objective standard of reasonableness, and we need not consider the prejudice prong of the *Strickland* analysis. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

***Trial Counsel's Decision to not Object to Admission of Exhibits 11 and 12***

[¶32.] The State offered Exhibit 11, a video recording of A.S.'s Child's Voice interview, and Exhibit 12, the Child's Voice interviewer's summary report, at trial. Spaniol contends that trial counsel should have objected on hearsay grounds to the admission of these exhibits because the State failed to request a hearing on admissibility pursuant to SDCL 19-19-806.1[2] to establish whether the "time,

---

2.      SDCL 19-19-806.1 provides:

> A statement made by a child under the age of thirteen, or by a child thirteen years of age or older who is developmentally disabled as defined in § 27B-1-18, describing any act of sexual contact or rape performed with or on the child by another, or
>
>                                                        (continued . . .)

content, and circumstances" of A.S.'s out-of-court statements "provided sufficient indicia of reliability" to warrant their admission.[3] The State responds that "[g]enerally, the decision of whether to make an objection or motion is a decision within the discretion of trial counsel" and that, because A.S. had already been found

_____

(. . . continued)

> describing any act of physical abuse or neglect of the child by another, or any act of physical abuse or neglect of another child observed by the child making the statement, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant or in any proceeding under chapters 26-7A, 26-8A, 26-8B, and 26-8C in the courts of this state if:
>> (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
>> (2) The child either:
>>> (a) Testifies at the proceedings; or
>>> (b) Is unavailable as a witness.
>
> However, if the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
>
> No statement may be admitted under this section unless the proponent of the statement makes known the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet the statement.

3. Spaniol cites *State v. Moriarty*, 501 N.W.2d 352 (S.D. 1993) (reversing and remanding for retrial based on trial court's failure to make "the proper determination as to the basis for admission under SDCL 19-16-2(2) [now SDCL 19-19-801(d)]"), and *State v. Thompson*, 379 N.W.2d 295 (S.D. 1985) (reversing and remanding for new trial based on the trial court's failure to make findings of reliability under SDCL 19-16-38 [now SDCL 19-19-806.1]), to support his claim that the exhibits could have been kept out of trial on hearsay grounds.

competent to testify prior to Exhibits 11 and 12 being offered at trial, the admission of the exhibits contributed to trial counsel's strategy of showing A.S.'s multiple inconsistent stories. Further, the State argues that trial counsel was able to use details in A.S.'s Child's Voice interview to advance a theory that A.S. contracted gonorrhea through a sex toy that she touched that had nothing to do with any acts by Spaniol. The State also asserts that trial counsel used Exhibits 11 and 12 on cross-examination to argue that the methods used by the interviewer were suggestive.

[¶33.] At the habeas hearing, trial counsel testified that he made the strategic decision not to object to the admission of Exhibits 11 and 12 because he used information in the exhibits to further Spaniol's defense theories and impeach A.S.'s credibility. Trial counsel's objection to Exhibits 11 and 12 on the basis of hearsay would have required a SDCL 19-19-806.1 hearing regarding the reliability of the child's statements in the exhibits before being admitted. However, we cannot say on this record, that trial counsel's decision not to object, for the reasons described in his habeas testimony, was not part of a sound trial strategy. Further, Spaniol has not established that trial counsel's failure to object to these exhibits resulted in prejudice.

[¶34.] Spaniol disagrees and argues that he was prejudiced because trial counsel did not demand a hearing under SDCL 19-19-806.1, which in Spaniol's view may have resulted in the exclusion of Exhibits 11 and 12. Spaniol contends that the "trial court never applied the information offered regarding A.S.'s competency to the Child's Voice statements in order to assess their reliability[,]" and, if the court had

considered reliability, "the statements would not have been admitted." In response, the State asserts that Spaniol has failed to establish that the exhibits would have been excluded had trial counsel objected to their admission because they would have been admissible under SDCL 19-19-806.1. We note that the narrow question of the exhibits' admissibility is not the test for prejudice under the second prong of the *Strickland* analysis, which instead contemplates a broader inquiry regarding the reliability of the result at trial. Nevertheless, we agree with the State that Exhibits 11 and 12 would likely have been admissible even if trial counsel had objected to them.

[¶35.]     SDCL 19-19-806.1 provides that in child sex abuse cases, a child's otherwise inadmissible prior statement regarding the abuse is admissible if the trial court "finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability" and the child testifies or is unavailable. If the child is unavailable as a witness, the statement may still be admitted if there are sufficient indicia of reliability and "there is corroborative evidence of the act." *Id.*

[¶36.]     Here, if trial counsel had objected to Exhibits 11 and 12 as inadmissible hearsay, the trial court would have held the requisite SDCL 19-19-806.1 hearing. Had the hearing been held, Spaniol presents no argument, other than A.S. should have been found incompetent to testify and that Exhibits 11 and 12 would not have met the sufficient indicia of reliability standard. Having previously affirmed the circuit court's determination that A.S. was competent to testify, Spaniol's only asserted claim of prejudice in trial counsel's failure to object

to Exhibits 11 and 12 fails. *See Spaniol*, 2017 S.D. 20, ¶ 19, 895 N.W.2d at 337 ("Based upon our review of the record, the circuit court did not abuse its discretion when it found A.S. competent to testify.").

[¶37.]        Had trial counsel objected to their admission, Exhibits 11 and 12 would likely have been admissible under SDCL 19-19-806.1 after the appropriate hearing and findings. And based upon A.S.'s trial testimony; the evidence corroborating her testimony, including Spaniol's suspected gonorrhea; his incriminating internet search history; and Spaniol's taped confessions in which he admitted to penetrating A.S. on multiple occasions; we conclude that the strong evidence suggesting Spaniol's guilt did not make the jury's guilty verdict unreliable even if Exhibits 11 and 12 were improperly admitted. Thus, Spaniol has failed to demonstrate prejudice.

### *Trial Counsel's Alleged Failure to Investigate Evidence of a Third-Party Perpetrator*

[¶38.]        Spaniol contends that trial counsel received information after trial from Nisich relaying claims by Anderson that he received information from Mother about a potential third-party perpetrator. Spaniol alleges that trial counsel did not sufficiently investigate this information and that counsel should have sought a remand from this Court when the case was pending on direct appeal so that trial counsel could file a motion in circuit court for a new trial based on the new third-party perpetrator information. At the habeas hearing, Spaniol introduced a letter written by his trial counsel after his trial in which counsel mentioned information received from Spaniol's mother that may have indicated a potential third-party

perpetrator. However, the letter stated that trial counsel thought the information was too speculative to act on.

[¶39.] In response, the State notes trial counsel's testimony that he did not remember talking to Anderson, Nisich, or anyone else after Spaniol was sentenced. The State contends that the letter introduced by Spaniol presented a reasonable professional judgment to not investigate further because the information from Spaniol's mother mentioned in the letter was not verifiably "true, correct, or more than just gossip." Furthermore, the State points out that neither Nisich nor Anderson, in the evidence presented at the habeas hearing, claimed to have communicated this information to trial counsel via Spaniol's mother. Thus, the State argues that the information referenced in trial counsel's letter may not have been related to Anderson's claims and also notes that, in her testimony at the habeas hearing, Mother flatly denied Nisich and Anderson's story. Because of the "speculative and hearsay within hearsay status of the information, offered after the case was on appeal," the State argues that trial counsel's decisions were reasonable.

[¶40.] "This Court has found ineffective assistance 'when counsel failed to inquire of known witnesses[.]'" *Dillon*, 2007 S.D. 81, ¶ 13, 737 N.W.2d at 426 (quoting *New v. Weber*, 1999 S.D. 125, ¶ 13, 600 N.W.2d 568, 574). Here, trial counsel specifically denied knowing of Nisich and Anderson's third-party perpetrator story when Spaniol's case was pending on direct appeal. Although Spaniol introduced the letter from trial counsel into evidence regarding some kind of unspecified new information while the case was on appeal, the letter does not explain what information Spaniol's mother shared, whether that information was

the same information that Nisich and Anderson described, or whether it was different from leads investigated before trial.

[¶41.] Even assuming that trial counsel knew of Nisich and Anderson's story while Spaniol's case was on direct appeal, Nisich's and Anderson's information was attenuated, speculative, and hearsay within hearsay. This information allegedly was disclosed by Mother, who, at the habeas hearing, emphatically denied having made the statements as alleged to Anderson. Thereafter, the information was allegedly disclosed by Anderson to Nisich, then by Nisich to trial counsel after trial. Such a chain of hearsay does not suggest that the alleged statements held much veracity to warrant further investigation.

[¶42.] Additionally, to act on this information at the stage it was allegedly received would have required trial counsel to seek a remand from this Court, and if the case was remanded, Spaniol would have been required to meet the high evidentiary burden to establish entitlement to a new trial.[4] Therefore, trial counsel's decision not to move to remand a potentially meritorious direct appeal for a dubious chance at a new trial does not fall below the objective standard of reasonableness. Because Spaniol has failed to show that trial counsel's

---

4.  A new trial will be granted only if the defendant demonstrates that "(1) the evidence was undiscovered by the movant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that no lack of diligence caused the movant to fail to discover the evidence earlier." *State v. Muhm*, 2009 S.D. 100, ¶ 43, 775 N.W.2d 508, 523 (citation omitted). Whether the trial court grants a new trial "rests in the solemn discretion of the trial court, and depends largely on the credibility of the new evidence." *State v. Gerdes*, 258 N.W.2d 839, 843 (S.D. 1977).

performance fell below the objective standard of reasonableness in this respect, we need not reach the issue of prejudice.

## Conclusion

[¶43.] Spaniol failed to establish that his trial counsel provided ineffective assistance. Regarding trial counsel's decision not to hire an expert to assist him in addressing A.S.'s competency, Spaniol failed to show that trial counsel's performance fell below the objective standard of reasonableness. As to trial counsel's failure to object to admission of Exhibits 11 and 12, Spaniol has failed to establish that trial counsel's performance was deficient or prejudicial. Lastly, as to trial counsel's decision not to investigate the alleged evidence of a third-party perpetrator, Spaniol has failed to show that trial counsel's decision constituted deficient performance. For these reasons, we affirm.

[¶44.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.